1

2

3

4

5

6

7

8                         UNITED STATES DISTRICT COURT

9                        NORTHERN DISTRICT OF CALIFORNIA

10                              San Francisco Division

11

12    LUCINDA RAMIREZ,                          Case No. 15-cv-02988-LB

13                Plaintiff,

14          v.                                  **ORDER GRANTING PLAINTIFF'S
                                                MOTION FOR SUMMARY JUDGMENT
15    NANCY A. BERRYHILL,                       AND DENYING DEFENDANT'S
                                                MOTION FOR SUMMARY JUDGMENT**
16                Defendant.
                                                Re: ECF Nos. 18 & 23
17

18                                   **INTRODUCTION**

19          Plaintiff Lucinda Ramirez moves for summary judgment, seeking judicial review of a final

20    decision by the Commissioner of the Social Security Administration ("Commissioner") denying

21    her Supplemental Security Income ("SSI") disability benefits under Title XVI of the Social

22    Security Act.[1] The Administrative Law Judge ("ALJ") found that Ms. Ramirez suffered from the

23    following severe impairments: irritable bowel syndrome ("IBS") and depression,[2] but held that

24    Ms. Ramirez retained sufficient residual functional capacity ("RFC") such that she did not qualify

25

26    _____

27    [1] Motion for Summary Judgment – ECF No. 18 at 3. Record citations refer to material in the Electronic
      Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

28    [2] Administrative Record ("AR") 31, Finding No. 2.

ORDER — No. 15-cv-02988-LB

United States District Court
Northern District of California

for SSI benefits.[3] The Commissioner opposes Ms. Ramirez's motion for summary judgment and cross-moves for summary judgment.[4]

Under Civil Local Rule 16-5, the matter is deemed submitted for decision by this court without oral argument. All parties have consented to magistrate jurisdiction.[5] The court grants the plaintiff's motion, denies the Commissioner's cross-motion, and remands for the calculation and award of benefits.

## STATEMENT

### 1. Procedural History

Ms. Ramirez filed her disability claim on June 10, 2011, alleging disability beginning November 1, 2005.[6] The Commissioner denied her claim initially on November 16, 2011, and upon reconsideration on June 14, 2012.[7]

Ms. Ramirez appealed from the Commissioner's decision and requested a hearing before the ALJ.[8] The ALJ held an initial hearing on December 10, 2012.[9] Ms. Ramirez attended the hearing unrepresented, and the ALJ postponed the hearing to allow her to obtain representation.[10] Ms. Ramirez failed to attend a hearing on February 14, 2013,[11] but did attend, with legal counsel, at a subsequent hearing on August 6, 2013, before ALJ Brenton L. Rogozen.[12] A vocational expert also attended the August 2013 hearing.[13] On September 4, 2013, the ALJ issued its decision,

---

[3] AR 33–38, Finding No. 4 & 6.

[4] Cross-Motion – ECF No. 23.

[5] Consent Forms – ECF Nos. 8, 9.

[6] AR 29, 126, 295.

[7] AR 126–27.

[8] AR 144.

[9] AR 88.

[10] AR 90–91.

[11] AR 176.

[12] AR 98.

[13] *Id.*

United States District Court
Northern District of California

finding that Ms. Ramirez suffered from IBS and depression,[14] but concluding that Ms. Ramirez retained sufficient residual functional capacity ("RFC") such that she was not disabled and did not qualify for SSI benefits.[15] Ms. Ramirez requested review of the ALJ's decision by the Appeals Council,[16] and the Appeals Council found that none of the information submitted by Ms. Ramirez "provide[d] a basis for changing the Administrative Law Judge's decision."[17]

Based on an extension of time to file a federal suit,[18] Ms. Ramirez filed this action and moved for summary judgment or in the alternative for remand to the ALJ for further consideration.[19] The Commissioner responded and filed a cross-motion for summary judgment.[20] Ms. Ramirez replied to the Commissioner's motion.[21]

## 2. Summary of Record and Administrative Findings

### 2.1 Medical Records

#### 2.1.1 Dr. Scaramozzino: Ph.D., Psychology

Dr. Scaramozzino examined Ms. Ramirez on September 11, 2010, for a consultative comprehensive psychiatric evaluation.[22] Dr. Scaramozzino noted that Ms. Ramirez had driven herself to the exam and was cooperative throughout the interview and appeared not to be exaggerating her symptoms.[23] Ms. Ramirez indicated that she was not "working too good . . . mentally and physically" and was suffering from a "depressed mood" ("I cry everywhere. I'm sad all the time"), had "chronic pain" (a level 6–7 on a scale of 1 to 10), lack of interest in pleasurable

---

[14] AR 31.

[15] AR 33–38.

[16] AR 24.

[17] AR 8.

[18] AR 1.

[19] Motion for Summary Judgment – ECF No. 18.

[20] Cross-Motion – ECF No. 23.

[21] Reply – ECF No. 24.

[22] AR 267.

[23] AR 267, 272.

things, self-isolation, and "thoughts about self-harm, but with no current intent or plan."[24] She reported a history of alcohol abuse but said that she had stopped drinking approximately six years earlier at age 52.[25] She recalled being sexually molested as a young girl.[26] She said that she had been seeing a counselor for free psychotherapy, which was improving her symptom management.[27] She reported medical problems of bleeding and diarrhea, which were being treated and were starting to improve, but she suffered from "bladder and incontinence" issues.[28] She also reported living with her 80-year old mother for the past four years, who "underwrites all of her expenses."[29] She is single and never has been married but has three adult children.[30] She previously worked for 22 years as a bartender, but stopped in 2002, reportedly because of her health.[31] She reported having been arrested twice and jailed for four days and indicated that she was no longer on probation.[32] Dr. Scaramozzino stated that her dress was casual and presentable and that her "hygiene was good," as was her "eye contact."[33] Her speech was clear, easily understood, logical, and coherent.[34] Her attitude was "positive," though her facial expressions were "sad," and she presented as "mildly depressed."[35] Dr. Scaramozzino reported that her ability to act purposefully, think rationally, and deal effectively with her environment was moderately impaired primarily due to her depressed mood.[36]

---

[24] AR 267.

[25] AR 268; *see also* AR 267 (noting that her age at the time of the exam was 58).

[26] AR 267.

[27] AR 268.

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] AR 269.

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *Id.*

United States District Court
Northern District of California

1    Dr. Scaramozzino found that her knowledge, judgment, common sense, ability to distinguish

2    between similarities and differences, abstract thinking, memory recall, and attention and

3    concentration were not significantly impaired and were within normal ranges.[37] Ms. Ramirez

4    reportedly described her "typical day" as "wake up, eat breakfast, take her medicine, organize her

5    day around household chores and errands. She ends up watching television, working in the garden,

6    and going to her doctor's appointment."[38] She reported having no friends and no history of

7    physical altercations.[39] Dr. Scaramozzino found that she did not meet the criteria for posttraumatic

8    stress disorder ("PTSD") and had a current Global Assessment Function ("GAF") score of 60 with

9    a low score of 55 within the last year.[40] He reported that Ms. Ramirez's symptom severity was in

10   the moderate range with a "fair to good" likelihood of improvement within the next 12 months as

11   she now had regular access to medical care. Dr. Scaramozzino noted that Ms. Ramirez's attitude

12   about seeking employment was "good" and she has had a positive work history — though "[s]he

13   does not anticipate going back to being a bartender because of the possibility of regressing back to

14   drinking alcohol."[41] Dr. Scaramozzino concluded that Ms. Ramirez's ability to (i) manage her own

15   funds, (ii) understand and remember very short simple instructions, (iii) understand and remember

16   detailed instructions, (iv) maintain concentration and attention, (v) accept instructions from a

17   supervisor and respond appropriately, (vi) interact with coworkers, and (vii) conduct daily

18   activities and social functioning were not significantly impaired, but that her ability to complete a

19   normal workday and workweek without interruptions at a consistent pace was moderately

20   impaired due to her depressed mood complicated by her medical conditions, as was her ability to

21

22   [37] AR 270–71.

23   [38] AR 271.

24   [39] AR 270–71.

25   [40] *Id*. A GAF score purports to rate a subject's mental state and symptoms; the higher the rating, the better the subject's coping and functioning skills. *See Garrison v. Colvin*, 759 F.3d 995, 1002 n.4 (9th Cir. 2014) ("A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment.") (quotations omitted). "[A] GAF score between 41 and 50 describes 'serious symptoms' or 'any serious impairment in social, occupational, or school functioning.'" *Id*. "A GAF score between 51 to 60 describes 'moderate symptoms' or any moderate difficulty in social, occupational, or school functioning." *Id*.

28   [41] AR 272.

deal with various changes in the workplace setting.[42] It does not appear that Dr. Scaramozzino had access to or reviewed Ms. Ramirez's medical records as part of his evaluation.[43]

### 2.1.2  Dr. Wagner: Internal Medicine

Dr. Wagner examined Ms. Ramirez on September 16, 2010, for a comprehensive internal medicine evaluation.[44] Ms. Ramirez presented with chief complaints about "constant diarrhea," "bladder problems with incontinence," and "depression and anxiety."[45] Dr. Wagner noted that she reported "epigastric and diffuse abdominal pain" and a four-year history of diarrhea (with some blood), reporting "approximately 30 bowel movements each day" and only occasional solid stools.[46] Ms. Ramirez also reported "bladder incontinence at all times."[47] As a result of these conditions, Ms. Ramirez reported that when she goes out, she must take care to be aware of the location of bathrooms.[48] Ms. Ramirez said that she lives with her mother and does the cooking and cleaning around the house.[49] She also said that she is able to drive, go shopping, and has two small dogs that she cares for.[50] Dr. Wagner observed that her affect was somewhat depressed, but that she was able to get up from a chair and walk to the exam room without assistance.[51] She was able to bend over to take her shoes off and otherwise easily move on and off the exam table.[52] Dr. Wagner conducted a physical exam, including range-of-motions evaluation and adnominal probing.[53] He reported no significant abdominal tenderness and normal bowel sounds, but noted

---

[42] *Id.*

[43] *See* AR 267.

[44] AR 275.

[45] *Id.*

[46] *Id.*

[47] *Id.*

[48] AR 275–76.

[49] AR 276.

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] AR 276–78.

United States District Court
Northern District of California

that he did not have her outside medical record to help assess the cause of her diarrhea and bladder incontinence.[54] Based on his examination, he concluded that Ms. Ramirez had no limitations on sitting, walking, standing, lifting, or other workplace environment activities.[55]

### 2.1.3  Dr. Tuvera: Internal Medicine

Dr. Tuvera examined Ms. Ramirez on September 17, 2011, for a consultative comprehensive internal medicine evaluation.[56] Dr. Tuvera diagnosed Ms. Ramirez with "irritable bowel syndrome" ("IBS") and "depression."[57] Dr. Tuvera noted that she reported a history of IBS since 2004 manifested by frequent diarrhea and had a colonoscopy, which diagnosed her with IBS.[58] Ms. Ramirez reported that she had been a heavy smoker and drinker but had quit both and had tried medical cannabis, which helped with her symptoms.[59] Ms. Ramirez stated that she had her GED and other advanced education and had been babysitting for two years, bartending for 22 years, and working at a gasoline station for eight months.[60] Dr. Tuvera observed that her demeanor was calm and pleasant with good eye contact, she was easily able to get up from a chair and walk to the exam room without assistance, and appeared comfortable in her chair and well nourished, but her energy was "poor."[61] She was able to take her shoes off and otherwise easily move on and off the exam table.[62] Dr. Tuvera conducted a physical exam, including a range-of-motions evaluation and probing for any tenderness in her abdomen.[63] He reported no abdominal tenderness or distending and positive bowel sounds.[64] Based on his examination, he concluded that Ms.

---

[54] AR 277–78.

[55] AR 278–79.

[56] AR 292.

[57] AR 295.

[58] AR 292.

[59] AR 293.

[60] *Id.*

[61] *Id.*

[62] *Id.*

[63] AR 293–94.

[64] AR 293.

Ramirez should have no limitations on sitting, walking, standing for up to 6 hours, lifting capacity of 50 pounds occasionally and 25 pounds frequently, and manipulative or other workplace environment activities.[65] It does not appear that Dr. Tuvera had access to or reviewed Ms. Ramirez's complete medical records as part of his evaluation.[66]

### 2.1.4  Dr. Tabbaa: Gastroenterologist

Dr. Tabbaa is a gastroenterologist and one of Ms. Ramirez's treating physicians.[67] Dr. Tabbaa's notes indicate that Ms. Ramirez had an "unremarkable"[68] colonoscopy in 2008 and an upper GI endoscopy in 2010 diagnosing esophagitis reflux, hiatal hernia, and gastritis for which treatment and medication were prescribed.[69] On August 8, 2011, Ms. Ramirez presented with "GERD" (gastroesophageal reflux disease) and IBS with "irregular bowel habits" and "[d]iarrhea after eating."[70] Dr. Tabbaa recommended a follow-up with the GI clinic in two months and consideration of "[a]no-rectal manometry" test to evaluate her symptoms of fecal incontinence or constipation.[71] On October 20, 2011, Ms. Ramirez again presented with GERD and IBS with "irregular bowel habits."[72]

On January 9, 2012, Ms. Ramirez had a follow-up exam based on her continued symptoms of GERD and "cyclic diarrhea/constipation," including "loose stools with poor anal sphincter control."[73] Dr. Tabbaa noted "IBD" (presumably for "inflammatory bowel disease") with "fecal incontinence" and prescribed "Imodium."[74] On January 30, 2012, Ms. Ramirez presented again

---

[65] AR 295.

[66] *See* AR 292 (noting review of only two medical records).

[67] *See* AR 307, 308, 342.

[68] AR 307.

[69] AR 283–84.

[70] AR 342.

[71] *Id.*

[72] AR 308.

[73] AR 307.

[74] *Id.*

United States District Court
Northern District of California

with "bowel incontinence."[75] Dr. Tabbaa noted that the Imodium helped and ordered a refill on her prescription.[76] He also noted that she had lost weight, dropping from 150 to 144 pounds.[77]

On May 7, 2012, Ms. Ramirez again presented with symptoms of GERD, IBS, and "incontinence."[78] Dr. Tabbaa noted that the Imodium helped and ordered a refill on her prescription.[79] Although it appears inconsistent with the January 30 outpatient records (where he reported her weight dropping to 144 pounds), he noted that she had lost weight since her last visit, dropping from 156 to 150 pounds.[80] He recommended a follow-up exam with her primary care physician, Dr. Melo, for a possible neurological referral.[81]

On November 5, 2012, Dr. Tabbaa examined Ms. Ramirez as part of a six-month follow-up.[82] Dr. Tabbaa noted her reported irregular bowel habits with alternating diarrhea and constipation.[83] He again noted that the "Imodium and Metamucil helped" and that she had been examined by Dr. Palmer for "rectal prolapse" and was awaiting an endoscopic ultrasound.[84] He also noted her further weight loss from 150 pounds to 141 pounds.[85]

On February 12, 2013, Dr. Tabbaa completed a medical questionnaire on Ms. Ramirez.[86] In it, he confirmed his diagnosis of IBS and "fecal incontinence" and indicated that she needed surgery for the fecal incontinence.[87] He listed her symptoms as "Diarrhea, Constipation, wt. [weight] loss, Abdominal Pain, Fecal incontinence, Reflux Symptomes [sic]," noting that the symptoms had

---

[75] AR 421.

[76] Id.

[77] Id.

[78] AR 424.

[79] Id.

[80] Id.

[81] Id.

[82] AR 398.

[83] Id.

[84] Id.

[85] Id.

[86] AR 494–98.

[87] AR 494.

United States District Court
Northern District of California

lasted or could be expected to last more than 12 months and were poorly controlled with Imodium and Metamucil and that "emotional factors" also contributed to the severity of the symptoms.[88] Ms. Ramirez's condition was affected by depression, anxiety, stress, a low fiber diet, and a GI motility disorder.[89] Her diarrhea was chronic, occurring an estimated six times per day and had responded poorly to treatment, but that fecal incontinence could possibly benefit from surgery.[90] Dr. Tabbaa checked the box on the questionnaire stating that she was "[c]apable of low stress work" and thought that she could sit or stand for a period of only two hours each (presumably for a total of four hours) in an eight-hour working day.[91] Dr. Tabbaa noted that she would need access to a restroom and would need to be able to take unscheduled breaks on one to two minutes' notice that would last an average of 20 minutes.[92] Dr. Tabbaa said that Ms. Ramirez would sometimes need to clean up and change clothes following a diarrhea episode on a "daily" basis and that she could rarely lift less than 10 pounds and never lift more than 10 pounds.[93] Dr. Tabbaa noted that Ms. Ramirez could occasionally twist, stoop, and climb stairs or ladders, but rarely crouch or squat, and her "attention and concentration" would be "off task" for 20% of the day due to her symptoms, and she would experience both "good" and "bad" days, with her being absent for work for "bad" days about four times a month.[94]

　　Dr. Tabbaa saw Ms. Ramirez again on April 15, 2013.[95] His notes indicate that she was still awaiting a rectal ultrasound and surgery for her rectal prolapse, but that her medications helped her IBS and GERD symptoms and that she had gained weight from 141 pounds to 147 pounds.[96]

---

[88] Id.

[89] AR 495.

[90] Id.

[91] Id.

[92] AR 496.

[93] Id.

[94] AR 497.

[95] AR 522.

[96] Id.

### 2.1.5  Dr. Chan: Urologist

On October 1, 2012, Dr. Chan examined Ms. Ramirez.[97] Dr. Chan noted Ms. Ramirez's reported symptoms of urinary and fecal incontinence and her "rectal prolapse" and "weak anal sphincter" and referred her for a general surgery consultation for "stool incontinence" and "anal sphincter incompetence."[98]

### 2.1.6  Dr. Palmer: General/Colorectal Surgeon

On November 2, 2012, Ms. Ramirez was examined by Dr. Palmer for anal incontinence.[99] Dr. Palmer noted Ms. Ramirez's "longstanding history of fecal incontinence."[100] Ms. Ramirez reported a "history of having accidents on a near-daily basis . . . with both liquid and solid stool," with "occasional rectal bleeding."[101] She said she takes Imodium 4 times a day to "decrease her bowel movements" and experiences intermittent epigastric and lower abdominal pain.[102] Dr. Palmer performed an anorectal exam noting a wide or "patulous anal canal"[103] and further observed minimal sphincter tone and minimal squeeze pressure upon digital exam as well as obvious full-thickness rectal prolapse.[104] His post-exam impressions were "[f]ecal incontinence" and "full-thickness rectal prolapse," and he recommended an endoanal ultrasound to determine the extent of sphincter injury, if any, as the appropriate next step.[105]

---

[97] AR 409–10; *see also* AR 408 (identifying Dr. Chan).

[98] AR 409–10.

[99] AR 399–401.

[100] AR 399.

[101] *Id.*

[102] *Id.*

[103] AR 401.

[104] *Id.*

[105] *Id.*

### 2.1.7  Dr. Melo & PA Marcus: Laurel Mental-Health Unit

Dr. Melo is a primary care physician and a treating physician.[106] On October 20, 2011, Dr. Melo saw Ms. Ramirez in the emergency room and treated her for depression.[107] He prescribed an antidepressant medication and noted that Ms. Ramirez was being evaluated for bipolar disorder at a different facility.[108] Ms. Ramirez said that she was taking care of a cousin and enjoys gardening.[109] Dr. Melo observed that she was tearful but had appropriate eye contact, was alert, and appeared well-developed and well-nourished.[110]

Several weeks later, on November 2, 2011, Ms. Ramirez went to the Laurel Mental Health Unit, where she reported symptoms that included depression and anxiety.[111] Physician's Assistant ("PA") Marcus performed the initial assessment and noted that Ms. Ramirez reported symptoms of depression, including depressed mood, excessive alcohol consumption, fatigue, feelings of worthlessness/guilt, hopelessness, tearfulness, and some suicidal thoughts.[112] Ms. Ramirez also reported anxiety symptoms of fatigue, irritability, sleep disturbance, social anxiety, and uncontrolled worry, and PTSD symptoms of avoidance, flashback, intrusive memories, and nightmares.[113] She reported difficulty falling asleep (but reported sleeping an average of eight hours per night) and gaps in the long-term memory but denied any distractibility or short-term attention span issues.[114] She reported that her treatment with antidepressant medication and her use of cannabis daily (if available) and alcohol two to three times per month, both alone and socially.[115] She reported stress arising from living with a cousin with mental-health issues, her

---

[106] *See, e.g.*, AR 425, 375, 480.

[107] *See* AR 425–26.

[108] *Id.*

[109] *Id.*

[110] *Id.*

[111] AR 386–87.

[112] AR 387.

[113] *Id.*

[114] *Id.*

[115] *Id.*

experience of childhood sexual molestation, and her admission to county jail on at least five occasions for domestic violence against her last partner.[116] PA Marcus found her cooperative with appropriate dress, hygiene, eye contact, attention, and concentration, but depressed and tearful.[117] He found her judgment and insight to be fair and her memory generally intact though not formally tested.[118] He concluded that she had "[m]ajor depression," PTSD, and alcohol and cannabis dependencies in remission with a GAF rating of 48, ranging from 55 to 48 in the past 12 months; he also noted her reported IBS.[119]

Two weeks later, on November 17, 2011, Ms. Ramirez returned to the Laurel Mental Health Unit and was seen by Dr. Melo who diagnosed her with depression and IBS.[120] Evaluation records reflect that she was started on Prozac medication and note that she cares for a cousin and acknowledges that she is a valuable member of her family.[121] Dr. Melo also noted that Dr. Tabbaa saw Ms. Ramirez for her IBS and thought that her symptoms could be anxiety related.[122] Ms. Ramirez reported continued "abdominal pain, frequent diarrhea and occasional blood in stool," but none currently.[123] At this time, a Dr. Rosa noted that Ms. Ramirez's IBS could benefit from non-pharmacological treatments such as stress-reduction exercise and a healthy diet.[124]

On December 1, 2011, Ms. Ramirez had a follow-up appointment with PA Marcus and reported improvement in her mood, but increases in "bloody diarrhea" and "abdominal distention."[125] PA Marcus noted that Ms. Ramirez was still living with her mentally ill cousin, which was stressful, but she planned to move home with her mother.[126]

---

[116] AR 388.

[117] *Id.*

[118] *Id.*

[119] AR 388–90.

[120] AR 375.

[121] AR 376.

[122] *Id.*

[123] *Id.*

[124] *Id.*

[125] AR 360.

[126] *Id.*

1    On January 30, 2012, Ms. Ramirez had another follow-up appointment and reported to PA

2    Marcus a decrease in her depression symptoms since going on medication, but said that she was

3    still having "episodes of nervousness" related to her "IBS symptoms."[127]

4    On May 23, 2012, Ms. Ramirez had another follow-up appointment with Dr. Melo.[128] Dr.

5    Melo noted that Ms. Ramirez had a long history of reported progressive bladder and bowel

6    "incontinence" problems (and occasional bloody stools) and had been seeing Dr. Tabbaa for years

7    but had been unable to identify the etiology/source despite two colonoscopies, which were

8    unremarkable, and that Dr. Tabbaa had recommended a referral to a neurologist.[129] Dr. Melo noted

9    that she continued to exhibit for depression and was nervous/anxious, and had reported that she

10   stopped taking her anti-depression medication because "it made her stay in bed all day."[130] Dr.

11   Melo physically examined Ms. Ramirez and noted that she exhibited "slightly diminished rectal

12   tone, brown stool, no gross blood, no external hemorrhoids."[131]

13   On May 29 and August 10, 2012, Ms. Ramirez saw a licensed clinical social worker

14   ("LCSW") to help develop coping strategies for her depression.[132]

15   On May 31, June 28, July 12, August 22, and October 25, 2012, Ms. Ramirez met with PA

16   Marcus.[133] During the May 2012 follow-up, PA Marcus noted her continued feelings of sadness,

17   fatigue, and flashbacks of past abuse, and assigned her a GAF rating of 48.[134] During her June

18   2012 follow-up, she acknowledged stopping her anti-depression medications due to increased

19   abdominal pain and reported continued symptoms of depression and nervousness.[135] She noted

20   that her SSI claim resolved and that it had been determined that she can work, but that she planned

21

22   ────────────────

     [127] AR 486.

23   [128] AR 480.

     [129] *Id.*

24   [130] *Id.*

25   [131] AR 481.

26   [132] AR 474, 455.

     [133] AR 470, 464.

27   [134] AR 470–71.

28   [135] AR 464.

ORDER — No. 15-cv-02988-LB            14

to appeal that decision.[136] She indicated that she was working informally as a part-time babysitter one time a month.[137] PA Marcus assigned her a GAF rating of 50.[138] At the July 2012 follow-up, she again indicated improvement in energy level since taking a new medication but still presented with feelings of sadness, nervousness, and worthlessness as well as "frequent bloody bowel movements."[139] PA Marcus again assigned her a GAF rating of 50.[140] At the August 2012 follow-up, she again indicated improvement in energy level, but still had feelings of sadness, nervousness, and worthlessness as well as "frequent bladder and bowel incontinence episodes, [e]specially when lifting weights," noting that such "episodes had happened when babysitting."[141] PA Marcus assigned her a GAF rating of 55.[142] At the October 2012 follow-up, she again indicated improvement in energy level, but still had feelings of nervousness and irritability that were not responsive to the LCSW's suggested deep breathing exercises.[143] She also said that she still had "abdominal distension and bloody diarrhea" and noted that she was "interested in providing information of recent Medical diagnosis to SS in order to support her claim for social security benefits."[144] PA Marcus assigned her a GAF rating of 55.[145]

On February 5, 2013, PA Marcus and a Dr. Fernandez jointly signed a medical questionnaire for Ms. Ramirez.[146] In it, they noted that Ms. Ramirez suffers from "Major Depression Recurrent," recapped her symptoms, treatments, and medications, and maintained her current GAF rating of 55.[147] They opined that her ability to do unskilled labor on a variety of dimensions is "seriously

---

[136] Id.

[137] Id.

[138] Id.

[139] AR 456.

[140] AR 457.

[141] AR 453.

[142] AR 457.

[143] AR 448.

[144] Id.

[145] AR 449.

[146] AR 514–19.

[147] AR 514–15.

limited" and ticked the box designating that she would likely manifest noticeable difficulty 11% to 20% of the workday.[148] They reached similar conclusions for her ability to do semiskilled or skilled work or to do particular types of jobs with public interaction and other specific elements.[149] They noted that Ms. Ramirez does not have a low IQ or psychiatric sensitivity that would exacerbate her physical symptoms.[150] They reported that Ms. Ramirez has "Marked" (which is defined in the questionnaire as "more than moderate but less than extreme") restrictions on her "daily living" activities, "[d]ifficulties in maintaining social functioning" and "[d]ifficulties in maintaining concentration, persistence or pace."[151] They opined that she was likely to experience four or more episodes of decompensation within a 12-month period, each lasting two weeks or more.[152] They concluded by anticipating that Ms. Ramirez's mental impairments would cause her to be absent more than four days a month and that her impairments have been present since November 2, 2011.[153]

PA Marcus had follow-up sessions with Ms. Ramirez on January 24, March 11, April 11, May 14, and June 18, 2013.[154] At the January 2013 session, PA Marcus noted that Ms. Ramirez reported daily experience of incontinence of urine and stools that prevented her from engaging in any substantial gainful activity.[155] At the May 2013 session, Ms. Ramirez stated that the medication was increasing her diarrhea episodes and that she was continuing to smoke cannabis because it helps with her mood and with the diarrhea.[156] PA Marcus noted a GAF rating of 55.[157]

---

[148] AR 516.

[149] AR 517.

[150] *Id.*

[151] AR 518.

[152] *Id.*

[153] AR 519.

[154] AR 553, 543, 534, 527.

[155] AR 553.

[156] AR 534.

[157] AR 535.

Both PA Marcus and the LCSW noted that Ms. Ramirez was unhappy with the delay on her disability claim and reported that it was "straining" her relationship with her then lawyer.[158]

At the June 2013 session, PA Marcus noted that she continues to be "depressed" and "tired due to chronic weakness in her arms and limitations due to fecal/urinary incontinence" related to IBS.[159] She is "[n]ot involved in substantial any gainful activity due to chronic physical limitations and sadness, distractibility memory impairment related to her depressive symptoms."[160] PA Marcus continued to classify her memory as "normal memory (recent and remote)" and her "[a]ttention and concentration" as normal.[161] PA Marcus maintained her GAF rating at 55.[162]

### 2.2  Ms. Ramirez's Testimony

On August 6, 2013, Ms. Ramirez testified before the ALJ.[163] Her attorney first asked Ms. Ramirez about her educational background and work history.[164] Ms. Ramirez said that she had completed her GED[165] and worked for 22 years as a bartender until 2004, when she stopped because she "could not hold [her] urine or [her] bowel movements" and because she quit drinking alcohol and left, in part, to help maintain her sobriety.[166] She then worked at a gas station initially as a cashier and then doing maintenance work for approximately eight months, but her "problem" of "diarrhea" and "cramping" "continued to get worse."[167] She worked the night shift alone and was once robbed, which made her nervous and fearful.[168] The gas station had only a public

---

[158] *See* AR 544, 549–50.

[159] AR 527.

[160] *Id.*

[161] *Id.*

[162] AR 528.

[163] AR 98–118.

[164] AR 101.

[165] *Id.*

[166] AR 101–02.

[167] AR 102.

[168] AR 103.

restroom, which meant there were times when it was occupied when she needed to use it.[169] She lived close by, and she would sometimes drive to her home to use the bathroom — and to change clothes if she had an accident on the way.[170] Ms. Ramirez noted that sometimes she would get only half a minute's notice of a bowel movement or other times no notice at all, "like releasing gas," and that it was "embarrassing."[171] She said she eventually "couldn't take it" and "quit the job."[172]

Ms. Ramirez testified that she previously applied for benefits but did not pursue it, and that her condition has gotten worse.[173] She said that she stays at home "all the time" where she has "less accidents," and uses "pads of different sizes," "diapers," and "a pad covering her mattress" and can change her clothes.[174] Without her medication, Imodium, she said "it was one constant bowel movement" with stomach and rectal pain.[175] She found it was "better" to go and stay in the shower until it was over.[176] Ms. Ramirez also noted that she suffered from both fecal and urinary incontinence and takes four Imodium tablets every four hours, which "keeps it under control."[177] She went on to state that "[w]ith more stress, the more I have to use the bathroom . . . 20 to 30 times a day."[178] If things are minimally controlled, seven to ten times a day.[179]

Ms. Ramirez testified that there were moisture issues even when she was not experiencing fecal or urinary incontinence because of a prolapsed rectum and uterus.[180] She indicated that she was awaiting a rectal ultrasound for her prolapsed rectum but that it was delayed while her

---

[169] AR 104.

[170] *Id.*

[171] *Id.*

[172] AR 102.

[173] AR 105; *see also* AR 124–25 (dismissing a 2009 appeal to an ALJ for failure to appear).

[174] *Id.*

[175] AR 106.

[176] *Id.*

[177] AR 106–08.

[178] AR 109.

[179] AR 110.

[180] AR 110–11; *see also* AR 281 (history of uterine prolapse) and AR 401 (rectal prolapse).

medical coverage issues were sorted out (but that she was willing to have the necessary corrective procedures).[181]

Ms. Ramirez then testified about her psychiatric condition and treatment, stating that she "started falling apart" and "couldn't stop crying."[182] She related that she was seeking help at rape crisis center because of a recently remembered childhood molestation.[183] Ms. Ramirez agreed that her IBS symptoms were exacerbated by stress and anxiety.[184] She observed that "[w]hen I have an accident in public, maybe nobody else would know but I do and it takes me a long time to get over that all by myself . . . . I can't face the public."[185] Asked if she could manage if her work were not involved with the public, she replied "then maybe I could work something out," but did not know whether she could "still concentrate and continue to do her work."[186]

Ms. Ramirez submitted an "exertional questionnaire" dated July 1, 2011, where she described the limitations on her activities associated with her diarrhea issues.[187]

### 2.3  Vocational Expert Testimony: Darlene McQuary

Darlene McQuary, a vocational expert ("VE"), testified at the hearing on August 6, 2013.[188] The ALJ first asked the VE to classify Ms. Ramirez's past work, which the ALJ limited to her more recent work at the gas station.[189] Ms. Ramirez's attorney then asked a hypothetical question: if a person with the same vocational background as Ms. Ramirez had the limitations outlined by Dr. Tabbaa in his February 12, 2013 questionnaire[190] (including walking only two city blocks

---

[181] AR 111.

[182] AR 111–13.

[183] AR 112.

[184] AR 109, 116.

[185] AR 117.

[186] *Id*.

[187] AR 217–19.

[188] AR 117.

[189] AR 118.

[190] AR 118–19. *See also* AR 494–98.

United States District Court
Northern District of California

without stopping, sitting or standing for only two hours each (for a total of four hours per eight-hour work day), taking unscheduled breaks every 90–120 minutes lasting an average of 20 minutes each, lifting only 10 pounds rarely and never anything more, and requiring to be off work 20% of the time, *et cetera*), whether such a person could perform Ms. Ramirez's past work.[191] The vocational expert testified that such a person could not, and that no other work would be available.[192]

### 2.4  Administrative Findings

The ALJ held that Ms. Ramirez was not disabled within the meaning of the Social Security Act from June 10, 2011, the date the application was filed.[193]

The ALJ observed that the Commissioner has established a sequential five-step evaluation process to determine if an individual is disabled.[194] At step one, the ALJ must determine whether the individual is engaging in "substantial gainful activity."[195] At step two, the ALJ must determine whether the individual has a "medically determinable impairment" that is "severe" or a combination of impairments that is "severe."[196] At step three, the ALJ must determine whether the individual's impairments are severe enough to meet a "listed" impairment.[197] At step four, the ALJ must determine the individual's "residual functional capacity" and determine whether the individual can perform "past relevant work."[198] At step five, the ALJ must determine whether the individual can perform any other work.[199]

---

[191] AR 118–19.

[192] AR 119.

[193] AR 29–38.

[194] AR 29–30.

[195] *Id.* at 30.

[196] *Id.*

[197] *Id.*

[198] *Id.*

[199] AR 30–31.

At step one, the ALJ found that that Ms. Ramirez had not engaged in substantial gainful activity since June 10, 2011, the application date.[200]

At step two, the ALJ found that Ms. Ramirez had the following severe impairments: "irritable bowel syndrome and depression."[201] The ALJ found that because these impairments had "lasted more than 12 months" and were "more than a limitation" on Ms. Ramirez's "physical or mental ability to do basic physical work activities," they were "severe."[202]

At step three, the ALJ found that Ms. Ramirez did not have an impairment or combination of impairments that met or medically equaled the severity requirements for any listed impairment.[203]

At step four, the ALJ reviewed and assessed the medical and other evidence and determined that Ms. Ramirez has the "residual functional capacity [("RFC")] to perform medium work as defined in CFR 416.967(a) and she can lift and carry 25 pounds frequently, 50 pounds occasionally, sit for six hours in an eight-hour workday and stand/walk for six hours in an eight-hour workday with the mental functional capacity for work involving simple repetitive tasks."[204] In reaching this conclusion, the ALJ granted "little weight" to the findings of the treatment providers Drs. Tabbaa and PA Marcus and Dr. Fernandez.[205] The ALJ also found that Ms. Ramirez's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [were] not entirely credible for the reasons explained in this decision."[206] Based on this RFC finding, the ALJ determined that she "is capable of performing past relevant work as a clerk cashier and janitorial worker."[207]

---

[200] AR 31.

[201] *Id.*

[202] *Id.*

[203] AR 31–32.

[204] AR 33.

[205] AR 36.

[206] AR 34.

[207] AR 37.

United States District Court
Northern District of California

Because the ALJ determined that Ms. Ramirez had the RFC to perform past relevant work, the ALJ did not go to step five to determine whether Ms. Ramirez could perform any other work.[208] The ALJ determined that Ms. Ramirez was not disabled from June 10, 2011, the date the application was filed.[209]

## ANALYSIS

### 1.  Standard of Review

Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the Commissioner if the claimant initiates the suit within 60 days of the decision. District courts may set aside the Commissioner's denial of benefits only if the ALJ's "findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal quotations omitted); 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). If the evidence in the administrative record supports both the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision. *See id.* at 1039–40; *Tackett v. Apfel*, 180 F.3d 1094, 1097–98 (9th Cir. 1999).

### 2.  Applicable Law

An SSI claimant is considered disabled if he or she suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and the "impairment or impairments are of such severity that he is not only unable to do his previous work but cannot,

---

[208] *See* AR 37–38.

[209] AR 37.

United States District Court
Northern District of California

considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(A), (B).

There is a five-step analysis for determining whether a claimant is disabled within the meaning of the Social Security Act. *See* 20 C.F.R. § 404.1520. The five steps are as follows:

**Step One.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" and is not entitled to benefits. If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one, and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(a)(4)(i).

**Step Two.** Is the claimant's impairment (or combination of impairments) severe? If not, the claimant is not disabled. If so, the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

**Step Three.** Does the impairment "meet or equal" one of a list of specified impairments described in the regulations? If so, the claimant is disabled and is entitled to benefits. If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(a)(4)(iii).

**Step Four.** Considering the claimant's residual functional capacity ("RFC"), is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled and is not entitled to benefits. If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step. *See* 20 C.F.R. § 404.1520(a)(4)(iv).

**Step Five.** Considering the claimant's RFC, age, education, and work experience, is the claimant able to "make an adjustment to other work?" If not, then the claimant is disabled and entitled to benefits. *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do. There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2. *See* 20 C.F.R. § 404.1520(a)(4)(v).

For steps one through four, the burden of proof is on the claimant. *Tackett*, 180 F.3d at 1098. At step five, the burden shifts to the Commissioner to show that the claimant can do other kinds of work. *Id.*

### 3.   Application

Ms. Ramirez alleges that the ALJ erred by failing to (a) properly evaluate and weigh the medical opinion evidence when making his RFC finding (both as to Ms. Ramirez's physical and mental impairments) and (b) provide clear and convincing evidence of a specific and legitimate basis for finding that Ms. Ramirez's testimony was "not entirely credible."[210]

#### 3.1   ALJ Erred by Failing to Properly Evaluate and Weigh the Medical Opinion Evidence

The ALJ is responsible for "'resolving conflicts in medical testimony, and for resolving ambiguities.'" *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014) (quoting *Andrews*, 53 F.3d at 1039). An ALJ may not, however, interject or substitute her own medical opinion or diagnosis for that of the claimant's physician. *See Tackett*, 180 F.3d at 1102–03; *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975) (an ALJ is forbidden from making his own medical assessment beyond that demonstrated by the record); *see also Ladue v. Chater*, No. C-95-0754 EFL, 1996 WL 83880, at *3 (N.D. Cal. Feb. 16, 1996) (stating that "[d]isability hearings are not adversarial in nature" and "the ALJ has duty to develop the record" and "inform himself about [the] facts," even if "the claimant is represented by counsel").

In weighing and evaluating the evidence, the ALJ must consider the entire case record, including each medical opinion in the record, together with the rest of the relevant evidence. 20 C.F.R. § 416.927(b); *see also Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) ("[A] reviewing court must [also] consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (internal quotations omitted)).

Social Security regulations distinguish between three types of physicians: treating physicians; examining physicians; and non-examining physicians. 20 C.F.R. § 416.927(c), (e); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "Generally, a treating physician's opinion carries more weight than an examining physician's, and an examining physician's opinion carries more weight

---

[210] Motion for Summary Judgment – ECF No. 18 at 3, 10; *see also* AR 34 (finding that Ms. Ramirez's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely credible for the reasons explained in this decision").

than a reviewing [non-examining] physician's." *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (citing *Lester*, 81 F.3d at 830); *see also Sprague v. Bowen*, 812 F.2d 1226, 1231 (9th Cir. 1987) (the opinion of a treating physician is generally given the greatest weight because the treating physician "is employed to cure and has a greater opportunity to know and observe the patient as an individual"); *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996).

Accordingly, "[i]n conjunction with the relevant regulations, [the Ninth Circuit has] developed standards that guide [the] analysis of an ALJ's weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527). "To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Id.* (alteration in original) (internal quotations omitted). If the ALJ finds that the opinion of a treating physician is contradicted, the ALJ must provide "specific and legitimate reasons supported by substantial evidence in the record." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (internal quotations omitted); *see also Garrison*, 759 F.3d at 1012 ("If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence.") (internal quotations omitted)). "Where an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs." *Id.*; *see also* 20 C.F.R. § 404.1527(c)(2) ("If we find that a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, we will give it controlling weight.").

"If a treating physician's opinion is not given 'controlling weight' because it is not 'well-supported' or because it is inconsistent with other substantial evidence in the record, the [Social Security] Administration considers specified factors in determining the weight it will be given." *Orn*, 495 F.3d at 631. "Those factors include the '[l]ength of the treatment relationship and the frequency of examination' by the treating physician; and the 'nature and extent of the treatment relationship' between the patient and the treating physician." *Id.* (quoting 20 C.F.R.

United States District Court
Northern District of California

United States District Court
Northern District of California

§ 404.1527(b)(2)(i)–(ii)) (alteration in original). "Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided[,] the consistency of the medical opinion with the record as a whole[, and] the specialty of the physician providing the opinion . . . ." *Id.* (citing 20 C.F.R. § 404.1527(d)(3)–(6)). Even if the treating physician's opinion is not entitled to controlling weight, it still is entitled to deference. *See id.* at 632 (citing SSR 96-02p at 4 (Cum. Ed. 1996), 61 Fed. Reg. 34,490, 34,491 (July 2, 1996)). Indeed, "[i]n many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." *Id.* (quoting SSR 96-02p at 4).

Finally, an "ALJ errs when he rejects a medical opinion or assigns it little weight" without explanation or without explaining why "another medical opinion is more persuasive, or criticiz[es] it with boilerplate language that fails to offer a substantive basis for his conclusion." *Garrison*, 759 F.3d at 1012–13.

Here, the ALJ found that Ms. Ramirez's "impairments could reasonably be expected to cause the alleged symptoms," but the "frequency or severity" of her impairments were such that they would not "interfere significantly with her ability to work," and she had the residual functional capacity [RFC] to perform medium work."[211] In doing so, the ALJ gave "little weight" to the opinion of the treating physician Dr. Tabbaa about Ms. Ramirez's physical impairments or to the opinions of PA Marcus and Dr. Fernandez about her mental impairments.[212] Because the examining physicians' conclusions contradicted the treating physicians' conclusions, the court reviews the ALJ's determination on the more deferential "substantial evidence" standard to ensure that the decision was based on "specific and legitimate reasons supported by substantial evidence in the record," rather than on the "clear and convincing" evidence standard for "uncontradicted " medical evidence. *See Garrison*, 759 F.3d at 1012; *Ryan*, 528 F.3d at 1198.

---

[211] AR 33–34.

[212] AR 35–36.

In giving little weight to the treating physicians and other treatment providers, the ALJ focused primarily on the February 12, 2013 questionnaire completed by Dr. Tabbaa indicating significant physical limitations in all areas of functioning (*e.g.*, lifting more than ten pounds, sitting or standing more than a total of four hours per day, *et cetera*) and on a February 5, 2013 questionnaire completed by PA Marcus and signed by PA Marcus and Dr. Fernandez, indicating "marked" mental impairment of Ms. Ramirez in all areas of functioning and frequent (four or more per year) periods of decompensation lasting two weeks or more.[213] The ALJ specifically found that the conclusions in the two questionnaires were inconsistent with (or not supported by) (i) earlier treatment notes (including treatment notes from Dr. Tabbaa and PA Marcus), (ii) Ms. Ramirez's daily activities, and (iii) the medical opinions provided by the examining consultative physicians, Dr. Tuvera and Dr. Scaramozzino.[214]

Specifically, the ALJ noted that Dr. Tabbaa's determinations — that Ms. Ramirez could "rarely" lift less than ten pounds and could sit/walk/stand for only two hours in an eight-hour workday — were unsupported by the medical evidence, including an October 13, 2011 exam, purportedly by Dr. Tabbaa, in which he noted that Ms. Ramirez showed "normal effort on respiration and normal findings on cardiovascular" and a "normal" mood.[215] A review of the record, however, reveals that the observations on October 13, 2011, were not made by Dr. Tabbaa, but instead were made by an ER physician, who saw Ms. Ramirez when she was seeking a refill for an anti-depressant medication.[216] To the extent that the reasons that the ALJ identifies for discrediting a treating physician's findings are contradicted by the record, they are not legitimate. *See Garrison*, 759 F.3d at 1012 (ALJ must show "legitimate reasons that are supported by substantial evidence" to reject a treating physician's opinion); *cf. Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir. 1995) (upholding the ALJ's decision to reject an examining medical provider's

---

[213] *Id. See also* AR 494–97 (Tabbaa Questionnaire) & AR 514–19 (Marcus & Fernandez Questionnaire).

[214] AR 35–37.

[215] AR 35.

[216] AR 310–13 (record of ER visit by Ms. Ramirez with a Dr. Walls on 10/13/11).

United States District Court
Northern District of California

assessment which conflicted with the provider's own medical reports and testing). As such, the ALJ erred in relying on this part of the record to support his assertion that Dr. Tabbaa's responses on the February 12, 2013 questionnaire were inconsistent with his previous treatment observations.[217]

The ALJ next concluded that treatment notes on November 2, 2011 — indicating "weight gain" — were "inconsistent" with the "extreme limitations assessed by Dr. Tabbaa which he attributed to [Ms. Ramirez's] bowel problems."[218] The "weight gain" reference in the ALJ's decision appears to refer to an "x" mark under "Appetite" with the options of marking either "weight gain" or "weight loss" entered by PA Marcus on Ms. Ramirez's intake evaluation for mental-health services on November 2, 2011.[219] The ALJ presumably cites to this point because Dr. Tabbaa had diagnosed "wt. loss" as part of his responses on the February 12, 2013 questionnaire.[220]

First, it is unclear to what extent the ticking of a box noting "weight gain" in 2011 in the context of a mental-health form is inconsistent, contradictory, or even necessarily clinically relevant to Dr. Tabbaa's findings of Ms. Ramirez's "extreme limitations" (as they were characterized by the ALJ), especially given the lack of any additional context, information, or analysis.[221] Second, to the extent the ALJ cited it to specifically discredit Dr. Tabbaa's finding of "wt. loss" and thereby more generally to undermine some of the arguably more questionable findings in Dr. Tabbaa's February 13, 2013 questionnaire, it fails to do so. As noted below, although not without variations and discrepancies, the record shows that in the year that followed the November 2, 2011 "weight gain" notation cited by the ALJ, Ms. Ramirez lost significant weight; her weight dropped from over 160 pounds on November 2, 2011,[222] to 138 pounds

---

[217] *See* AR 35.

[218] *Id.*

[219] AR 387.

[220] AR 494.

[221] AR 35.

[222] AR 386.

1    precisely one year later on November 2, 2012.[223] Accordingly, Dr. Tabbaa's finding of "wt. loss"

2    several months later on February 13, 2013 — when Dr. Tabbaa completed the questionnaire — is

3    not inconsistent with or undermined by the "weight gain" notation on the November 2, 2011

4    evaluation and as such is not "legitimate" and "substantial evidence" to discredit Dr. Tabbaa's

5    findings. *See Garrison*, 759 F.3d at 1012.

6        The ALJ then cited Ms. Ramirez's 2010 upper GI endoscopy and its resulting diagnoses,

7    prescribed therapy, and recommended follow-up.[224] Given that the gravamen of Ms. Ramirez's

8    complaint is depression and IBS, and more specifically, the associated frequent unscheduled

9    bowel movements (often accompanied with diarrhea and fecal (and urinary) incontinence), this

10   reference to her upper GI issues adds little, if anything, to the analysis of her impairments and

11   their severity or to the weight that Dr. Tabbaa's diagnosis and accompanying assessment of her

12   ability to work should be given. The ALJ then notes that Ms. Ramirez has received only

13   "conservative therapies"[225] without making any assessment of their efficacy (or lack thereof),

14   other than noting elsewhere in the decision that her treating physician had found that she had been

15   "helped" by prescribed medication for her acid reflux and IBS.[226] While a claimant's favorable

16   response to minimal and conservative treatment can be evidence undermining the alleged severity

17   of a claimant's condition, *see Tommasetti v. Astrue*, 533 F.3d 1035, 1039–40 (9th Cir. 2012), the

18   ALJ's decision does not provide sufficient analysis to determine whether it was a legitimate basis

19   to discredit the treating physician's opinion. *See Garrison*, 759 F.3d at 1012 (ALJ's reasons for

20   discrediting or crediting one medical opinion over another must be "legitimate" and supported by

21   substantial evidence).

22       The ALJ then gave "significant weight" to the assessment of examining physicians Drs.

23   Tuvera and Scaramozzino.[227] While the ALJ acknowledged the limitations inherent in their "one-

United States District Court
Northern District of California

---

[223] AR 402; *see also* AR 398 (Dr. Tabbaa noting her weight dropping to 141 pounds as of November 5, 2012).

[224] AR 35.

[225] AR 35–36.

[226] AR 34.

[227] AR 37.

time" only interactions with Ms. Ramirez, he credited their status as "qualified physicians," their "objective examinations" and "detailed clinical findings," and their familiarity "with the Commissioner's regulations for evaluating disability."[228] "[T]he ALJ can reject the opinion of a treating physician in favor of the conflicting opinion of another examining physician if the ALJ makes findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." *Connett v. Barnhart*, 340 F.3d 871, 875 (9th Cir. 2003) (internal quotations omitted). Here, the ALJ failed to provide such specific and legitimate reasons supported by substantial evidence. *See id.*

Moreover, as the Ninth Circuit noted in *Orn*, "[w]hen an examining physician relies on the same clinical findings as a treating physician, but differs only in his or her conclusions, the conclusions of the examining physician are not 'substantial evidence.'" 495 F.3d at 632. Here, the examining physicians confirmed the diagnoses of IBS and depression, but differed from the treating physicians in their conclusions as to the severity and impact of those impairments.[229] As such, under *Orn*, to the extent that the conclusions of the examining physicians, as opposed to their "clinical findings," differ from Dr. Tabbaa's and any other treating physicians' conclusions, they are not substantial evidence. *See id.*

Likewise, the ALJ failed to cite specific, legitimate reasons supported by substantial evidence to give "little weight" to the findings of Dr. Fernandez in the questionnaire prepared by PA Marcus and signed by PA Marcus and Dr. Fernandez regarding Ms. Ramirez's mental impairments and their impact on her ability to work.[230] This despite there being, arguably, some conclusions and opinions in the questionnaire that may not be well-supported by the record[231] and what may be Dr. Fernandez's limited interactions with Ms. Ramirez.[232] In assessing Dr.

---

[228] *Id.*

[229] *See* AR 295, 278, 267, 272–73 (noting consulting physicians' diagnoses and conclusions), AR 494–98 (treating physician's conclusions).

[230] AR 35–36.

[231] *See* AR 518 (noting "functional limitations" of four or more episodes of decompensation lasting at least 12 weeks or more).

[232] The medical record shows extensive interactions between PA Marcus and Ms. Ramirez but does not document extensive interactions between Dr. Fernandez and Ms. Ramirez.

United States District Court
Northern District of California

1    Fernandez's findings, the ALJ found (based primarily on the evaluations by the examining

2    physicians, Dr. Scaramozzino and Dr. Tuvera) that Ms. Ramirez's routine activities — taking care

3    of her personal dress and hygiene, routinely taking her medicine, doing household chores, running

4    errands, gardening, watching TV, walking her dogs, caring for a relative, and shopping — all

5    evidenced her ability to "think and communicate and act in her own best interest" and

6    "establish[ed] a level of functioning greater than that alleged."[233]

7         While a claimant's daily activities may provide a specific and legitimate basis for a finding of

8    inconsistency with her disabling conditions, *see Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir.

9    2012); *Curry v. Sullivan*, 925 F.2d 1127, 1130 (9th Cir. 1991), the Ninth Circuit has "repeatedly

10   warned that ALJs must be especially cautious in concluding that daily activities are inconsistent

11   with testimony about pain," and thus with eligibility for disability benefits. *Garrison*, 759 F.3d at

12   1016. In *Garrison*, the Court recognized that disability claimants should not be penalized for

13   attempting to lead normal lives in the face of their limitations, finding that "only if [her] level of

14   activity were inconsistent with [a claimant's] claimed limitations would these activities have any

15   bearing on her credibility." *Id.* (alterations in original) (internal quotations omitted); *see also

16   Smolen*, 80 F.3d at 1284 n.7 ("The Social Security Act does not require that claimants be utterly

17   incapacitated to be eligible for benefits, and many home activities may not be easily transferable to

18   a work environment where it might be impossible to rest periodically or take medication."); *Fair

19   v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) ("[M]any home activities are not easily transferable

20   to what may be the more grueling environment of the workplace, where it might be impossible to

21   periodically rest or take medication.").

22        Here, the ALJ failed to engage in the necessary specific analysis of any inconsistencies

23   between the severity of Ms. Ramirez's reported limitations and her daily activities to enable

24   appropriate review. In particular, the ALJ failed to discuss how Ms. Ramirez's alleged bladder and

25   fecal incontinency were inconsistent with her reported daily activities.[234]

26

27   [233] AR 33–36.

28   [234] AR 34–37.

1   The ALJ also gave "little weight" to evidence from PA Marcus and Ms. Ramirez's other non-

2   physician treatment providers, who were not "acceptable medical sources."[235] "Only physicians

3   and certain other qualified specialists are considered '[a]cceptable medical sources.'" *Ghanim v.*

4   *Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014) (alteration in original) (citing *Molina*, 674 F.3d at

5   1111); *see also* 20 C.F.R. § 404.1513(a). Nurse practitioners, physicians' assistants, and therapists

6   are considered "other sources." *See* 20 C.F.R. § 404.1513(d) (2013);[236] *Ghanim*, 763 F.3d at 1161;

7   *Molina*, 674 F.3d at 1111. "While their opinions must still be evaluated, 20 C.F.R. § 404.1527(c),

8   the ALJ may discount testimony from these 'other sources' if the ALJ gives reasons germane to

9   each witness for doing so." *Ghanim*, 763 F.3d at 1161 (internal quotations omitted); *see also*

10  *Molina*, 674 F.3d at 1111–12; 20 C.F.R. §§ 404.1513, 416.913; SSR 06-03p, *available at* 2006

11  WL 2329939 ("[A]n opinion from a medical source who is not an 'acceptable medical source'

12  may outweigh the opinion of an 'acceptable medical source.").

13  Here, the ALJ discounted those opinions because (i) they were not "acceptable medical

14  sources" and (ii) their opinions were inconsistent with the claimant's daily functioning."[237] The

15  first reason, while accurate, is circular and not a "germane" reason to discount such evidence. *See*

16  *Haagenson v. Colvin*, 656 F. App'x. 800, 802 (9th Cir. 2016) (holding that the ALJ failed to

17  provide a germane reason for rejecting "other source" opinion evidence when "[t]he only reason

18  that the ALJ offered for rejecting their opinions is that they are not 'acceptable medical sources'

19  within the meaning of the federal regulation . . . [because] the regulation already presumes that

20  nurses and counselors are non-acceptable medical sources, yet still requires the ALJ to consider

21  them as 'other sources'"). The ALJ's second reason for rejecting the "other source" opinions also

22  is insufficient. While inconsistency with objective evidence is a germane reason to reject "other

23  source" evidence, *see Molina*, 674 F.3d at 1111–12, here, the ALJ failed to cite or discuss any

24

25  ───────────────────

    [235] AR 36.

26  [236] The Social Security Administration promulgated a new § 404.1513, effective as of March 27, 2017.

27  The previous version, effective September 3, 2013, to March 26, 2017, was in effect as of the date of
    the ALJ's hearing.

28  [237] AR 36–37.

United States District Court
Northern District of California

1  specific, supported, and germane inconsistencies between those opinions and Ms. Ramirez's

2  "daily functioning."[238] *See Ghanim*, 763 F.3d at 1161; *see also Bruce v. Astrue*, 557 F.3d 1113,

3  1115 (9th Cir. 2009) (the reasons for rejecting other source witness testimony must be "germane"

4  and "must be specific").

5      The ALJ also gave "some slight weight" to his own observations of Ms. Ramirez's

6  interactions, mobility, and "apparent lack of discomfort" at the ALJ hearing.[239] The Ninth Circuit

7  has repeatedly rejected the ALJ's denial of benefits "based on the ALJ's observation of [the

8  claimant], when [the claimant's] statements . . . are supported by objective evidence." *Perminter v.*

9  *Heckler*, 765 F.2d 870, 872 (9th Cir. 1985) (the court "condemned" "[t]he ALJ's reliance on his

10  personal observations . . . at the hearing," characterizing it "as 'sit and squirm' jurisprudence")

11  (quoting *Freeman v. Schweiker*, 681 F.2d 727, 731 (11th Cir. 1982)).

12      Here, the ALJ's observations of Ms. Ramirez's "lack of discomfort" during the approximately

13  40-minute long hearing[240] is not "clear and convincing" evidence supporting the ALJ's adverse

14  credibility finding, particularly where her testimony and the record suggests that her symptoms

15  were intermittent.[241] *See Perminter*, 765 F.2d at 872; *Garrison*, 759 F.3d at 1014–15; *see also*

16  *Gallant v. Heckler*, 753 F.2d 1450, 1455 (9th Cir. 1984) (even when claimant alleges constant

17  pain, "[t]he fact that a claimant does not exhibit physical manifestations of prolonged pain at the

18  hearing provides little, if any, support for the ALJ's ultimate conclusion that the claimant is not

19  disabled or that his allegations of constant pain are not credible.").

20      The ALJ also noted that Ms. Ramirez was noncompliant with her treatment protocols because

21  she was a "no show" at a March 4, 2013 appointment.[242] While an ALJ can properly consider an

22  inadequately explained failure to seek treatment as an inconsistency with alleged severity of

23  impairments, *see Molina*, 674 F.3d at 1113, without more information, the court is unable to

24

25  [238] *See Id.*

26  [239] AR 36.

27  [240] AR 36; *see also* AR 100, 120 (noting the starting and ending times of the ALJ's hearing).

   [241] *See, e.g.*, AR 108.

28  [242] AR 35; *see also* AR 523 (referencing a "no show" on "3/4/13").

conclude that her failure to show up at one appointment constitutes "substantial evidence" of an inadequately explained failure to seek treatment. *See id.* The ALJ also noted that Ms. Ramirez has been prescribed medication and is receiving ongoing counseling for her depression symptoms, and these treatments "were successful in treating her symptoms."[243] Again, while evidence of a claimant's favorable response to minimal and conservative treatment can evidence undermining the alleged severity of a claimant's condition, *see Tommasetti*, 533 F.3d at 1039–40, the ALJ did not provide sufficient analysis to determine whether it is legitimate reason to discredit the treating physician's opinion supported by substantial evidence. *See Garrison*, 759 F.3d at 1012.

### 3.2  Ms. Ramirez's Testimony

In assessing a claimant's credibility, an ALJ must make two determinations. *Garrison*, 759 F.3d at 1014. "'First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id.* (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007) (internal quotations omitted)). Second, if the claimant has produced that evidence, and "there is no evidence of malingering," the ALJ must provide "specific, clear and convincing reasons for" rejecting the claimant's testimony regarding the severity of the claimant's symptoms. *Id.* at 1014–15 (quoting *Smolen*, 80 F.3d at 1281). In order to have meaningful appellate review, the ALJ must explain its reasoning and "*specifically identify* the testimony [from a claimant] she or he finds not to be credible and . . . explain what evidence undermines the testimony." *Treichler v. Comm'r of Soc. Sec.*, 775 F.3d 1090, 1102, 1103 (9th Cir. 2014) ("Credibility findings must have support in the record, and hackneyed language seen universally in ALJ decisions adds nothing.") (internal quotations omitted). "That means '[g]eneral findings are insufficient.'" *Id.* at 1102 (quoting *Lester*, 81 F.3d at 834); *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) ("[T]he ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony.") (citing *Bunnell*

---

[243] AR 35.

United States District Court
Northern District of California

1   *v. Sullivan*, 947 F.2d 341, 345–46 (9th Cir. 1991) (en banc)). Moreover, the court will "review

2   only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ

3   on a ground upon which he did not rely." *Garrison*, 759 F.3d at 1010.

4       Here, the ALJ first found that Ms. Ramirez's "medically determinable impairments could

5   reasonably be expected to cause the alleged symptoms"[244] and did not find that she was

6   malingering.[245] The ALJ, however, failed to identify those specific portions of Ms. Ramirez's

7   testimony that he found "not fully credible" and explain why they were not credible with "specific,

8   clear and convincing reasons." *Id.* at 1014–15. This was an error. *See id.*; *Holohan*, 246 F.3d at

9   1208; *see also* 42 U.S.C. § 405(b)(1) (noting the ALJ's responsibility to provide "a discussion of

10   the evidence").

11       The court has "discretion to remand a case either for additional evidence and findings or for an

12   award of benefits." *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002) (citing *Smolen*,

13   80 F.3d at 1292); *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989) ("The decision whether

14   to remand for further proceedings or simply to award benefits is within the discretion of [the]

15   court.") (citing *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987)).

16       In deciding whether to remand a social security case for further proceedings or for an

17   immediate award of benefits, the Ninth Circuit has promulgated the "credit-as-true" rule. *See*

18   *Garrison*, 759 F.3d at 1019–23; *Treichler*, 775 F.3d at 1100–02; *Benecke v. Barnhart*, 379 F.3d

19   587, 595 (9th Cir. 2004); *see also Connett*, 340 F.3d at 876; *Hammock v. Bowen*, 879 F.2d 498

20   (9th Cir. 1989). The credit-as-true rule applies to both "medical opinion evidence" and to

21   "claimant testimony." *Garrison*, 759 F.3d at 1020. Under the credit-as-true rule, a reviewing court

22   may credit evidence that was rejected during the administrative process and remand for an

23   immediate award of benefits if: (1) the ALJ failed to provide "legally sufficient reasons" for

24   rejecting the evidence; (2) "the record has been fully developed and further administrative

25   proceedings would serve no useful purpose"; and (3) "if the improperly discredited evidence were

26

27   [244] AR 34.

28   [245] *See* AR 29–38.

credited as true, the ALJ would be required to find the claimant disabled on remand." *Id.* (citing *Ryan*, 528 F.3d at 1202; *Lingenfelter*, 504 F.3d at 1041; *Orn*, 495 F.3d at 640; *Benecke*, 379 F.3d at 595; *Smolen*, 80 F.3d at 1292). If these three conditions are met, the court may remand for an award of benefits unless "an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled." *Garrison*, 759 F.3d at 1021; *see also McCartey*, 298 F.3d at 1076 (noting court's "discretion").

Generally, "'[i]f additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded.'" *Garrison*, 759 F.3d at 1019 (quoting *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981)) (alteration in original); *Treichler*, 775 F.3d at 1099, 1106 ("a reviewing court is not required to credit claimants' allegations regarding the extent of their impairments as true merely because the ALJ made a legal error in discrediting their testimony;" if "the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.") (citations omitted); *see also Dominguez v. Colvin*, 808 F.3d 403, 407 (9th Cir. 2015) ("Unless the district court concludes that further administrative proceedings would serve no useful purpose, it may not remand with a direction to provide benefits."); *McCartey*, 298 F.3d at 1076 (remand for award of benefits is discretionary); *McAllister*, 888 F.2d at 603 (remand for award of benefits is discretionary); *Connett*, 340 F.3d at 876 (finding that a reviewing court has "some flexibility" in deciding whether to remand).

Here, the court finds the three conditions are satisfied and remands with instructions for an award of benefits. First, as discussed above, the ALJ failed to provide "legally sufficient reasons" for finding Ms. Ramirez's testimony about her symptoms "not entirely credible" and for rejecting the medical opinion evidence of her treating physicians.

Second, there are "no outstanding issues that must be resolved before a determination of disability can be made." *Garrison*, 759 F.3d at 1019–20, n.26; *see also Treichler*, 775 F.3d at 1108, 1110 (Tashima J., dissenting) (noting the limited situations where the Ninth Circuit has determined that there were outstanding issues to be considered or resolved by the ALJ warranting a remand without instructions to award benefits). As discussed below, because the vocational

expert confirmed in his answer to the hypothetical that no alternative work would be available for someone with Ms. Ramirez's limitations, we need not remand for consideration of this fifth element of the five-step analysis.

Third, it is clear from the record that the ALJ would be required to find the claimant disabled were her testimony and the rejected medical opinion evidence of Drs. Tabbaa and Fernandez credited as true. *See Garrison*, 759 F.3d at 1020–22. During the ALJ's hearing, a hypothetical was given to the vocational expert ("VE") which closely tracked Ms. Ramirez's limitations as noted by Dr. Tabbaa in the questionnaire.[246] When asked whether a person with those limitations could perform Ms. Ramirez's past work, the VE testified that such a person could not perform that work, and that no other work would be available.[247] *See also Treichler*, 775 F.3d at 1096 (observing that the vocational expert in that case testified that an employer would not tolerate a situation where "twice a month at randomly and unpredictably times there's a loss of bowel control despite best efforts," and that there would not be any other available work for such a person).

### CONCLUSION

Ms. Ramirez's motion for summary judgment is granted, and the Commissioner's cross-motion for summary judgment is denied. The court remands the case for the calculation and award of benefits.

**IT IS SO ORDERED.**

Dated:  March 31, 2017

_____

LAUREL BEELER
United States Magistrate Judge

---

[246] AR 118–19.

[247] *Id.*

United States District Court
Northern District of California